UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

| | | |
|---|---|---|
| KRYGOSKI CONSTRUCTION COMPANY, INC., a Michigan Corporation | ) ) ) | |
| | ) | |
| *Plaintiff,* | ) | |
| *v.* | ) ) | No. 2:04-cv-076 |
| | | *Hon. R. Allan Edgar* |
| CITY OF MENOMINEE, a Michigan municipal corporation, and DOES 1 through 10, inclusive, | ) ) ) | |
| | ) ) ) | |
| *Defendants.* | ) | |

**MEMORANDUM**

This is an action for cost recovery under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675 ("CERCLA") and the Michigan Natural Resources and Environmental Protection Act, Mich. Comp. Laws §§ 324.20101 *et seq.* ("NREPA"). Plaintiff Krygoski Construction Company, Inc. ("Krygoski") seeks recovery of its alleged response costs pursuant to Section 107 of CERCLA. 42 U.S.C. § 9607. Plaintiff seeks its costs incurred in testing soil from property owned by the defendant City of Menominee ("Menominee") and for its attorneys' fees and expert fees.

Menominee brings a motion for summary judgment against Krygoski on its CERCLA and NREPA claims. [Court Doc. No. 198]. Krygoski also moves for summary judgment on the issues of liability and recovery. [Court Doc. No. 188]. After reviewing the entire record, the Court concludes that Menominee's motion will be **GRANTED**. Krygoski's motion will be **DENIED**.

## I.      Background

After reviewing the entire record, the Court finds the following relevant, undisputed facts. Menominee owns a 14-acre public park known as Spies Field.  [Court Doc. No. 193-3, Ex. A, p. 36].  The park contains one regular-sized baseball field and one smaller baseball field.  *Id.*  In 1996 Menominee created a task force to address the overcrowding and heavy use of Spies Field. Menominee first attempted to relocate the park, but in 2002, after running out of viable options, the task force decided to expand and renovate Spies Field.  *Id.* at pp. 35-36.  Subsequently, Menominee researched purchasing 2.7 acres of land located directly south of Spies Field (the "Site").  *Id.* at p. 49.  The Site was a wetland covered in dense vegetation that had been unused for the 20 years prior to 2002.  *Id.*

Before Menominee bought the Site, it contracted with STS Consultants, Ltd., a nationally-recognized environmental consulting company with 18 different offices, to conduct a Phase I Environmental Site Assessment of the Site.  [Court Doc. No. 193-6, Affidavit of Roger Miller ("Miller Aff.") ¶ 3].  STS has extensive experience conducting Phase I assessments.  *Id.* at ¶ 4.  A Phase I assessment consists of an initial investigation of a piece of property to review whether a property is contaminated by hazardous substances.  Phase I assessments are often completed prior to purchase.  [Court Doc. No. 193-2, Deposition of Chris Austin ("Austin Dep."), pp. 23-24].  STS completed the Phase I assessment in February of 2002 and determined that no "Recognized Environmental Conditions" existed at the Site.  Miller Aff., Ex. Menominee purchased the Site in March 2002 and began making plans for the Spies Field expansion and renovation.  [Court Doc. No. 193-4, Deposition of Anthony Furton ("Furton Dep."), Ex. 1].  The Site abuts several other commercial sites, including plaintiff Krygoski's

property.  [Court Doc. No. 193-2, p. 49].

In May of 2003, before Menominee began renovating the Site, Dale Pape Sr., a self-described environmental activist and corporate representative of Krygoski, undertook an inspection of the property.  The parties dispute the nature of this inspection.  Menominee asserts that it gave Mr. Pape no authority to inspect its property, and Krygoski maintains that as part of Menominee's bidding process for the renovation, potential bidders, including Krygoski, were allowed to inspect the property.  However, Krygoski provides no support in the record for its alleged version of the facts.[1]  Menominee provides support for its assertions that Mr. Pape had no permission to test soil on the Site and that the bid documents required such permission prior to testing.  [Court Doc. No. 193-9, Affidavit of George Cowell ("Cowell Aff."), ¶ 9].

Mr. Pape discovered areas on the Site that he believed contained contaminated substances.  In June of 2003, Mr. Pape took samples of soil from the Site and hired an outside testing company to analyze the contents of the soil.  The samples revealed elevated levels of lead and chromium.  [Court Doc. No. 193-7, Affidavit of Anthony Furton ("Furton Aff."), ¶ 3; Court Doc. No. 193-2, p. 61].  Menominee learned of Mr. Pape's tests of the Site through the local media.  *Id.*  After it learned of the potential contamination, Menominee immediately contacted the Michigan Department of Environmental Quality ("MDEQ") and STS.  *Id.*  Both STS and MDEQ agreed to visit the Site the next day to discuss the possible contamination and any cleanup.  *Id.*

On June 20, 2003 the Mayor of Menominee, as well as other city officials met with

---

[1]  Many of Krygoski's alleged facts are unsupported by any citation to or support in the record.  Thus, Krygoski fails to comply with Federal Rule of Civil Procedure 56(e).  This Court will not consider Krygoski's alleged facts not supported by the record.

engineers from STS and a geologist from MDEQ, Chris Austin.  Austin Dep., pp. 14-17.  The group discovered crushed barrels at the Site that contained a substance that appeared to be yellow paint.  *Id.*  STS also collected 12 soil samples and 9 soil borings.  [Court Doc. No. 193-2, p. 64].

Mr. Austin recommended that Menominee undertake the following actions: (1) place a fence around the area of estimated contamination; (2) sample areas around the contamination; (3) properly dispose of the contaminated substances; and (4) retrieve additional soil samples from the whole Site.  Austin Dep., pp. 34-35; [Court Doc. No. 193-2, pp. 9-10].  Menominee began implementing Mr. Austin's recommendations, and he testified in his deposition that Menominee's officials "did everything right."  Austin Dep., p. 34.

On July 11, 2003 Menominee officials again met with Mr. Austin at the Site.  An On-Scene Coordinator from the United States Environmental Protection Agency ("EPA"), Ken Rhame, also attended the meeting.  Because STS's samples from the June 20th meeting revealed excessive levels of lead and chromium, Menominee assured the EPA and the MDEQ that it would hire a contractor to remove vegetation from the Site and properly dispose of the contaminated waste.  The city also indicated that it would continue to retain STS to assist and investigate other areas of potential contamination at the Site.  Mr. Rhame indicated that EPA would not have recommended anything beyond what Menominee proposed to do to remediate the Site.  Austin Dep., pp. 38-40; [Court Doc. No. 193-2, pp. 20, 31].  Mr. Rhame wrote to Mr. Austin that "it is EPA's feeling that this project is being appropriately addressed by the City of Menominee and is being adequately monitored by the [MDEQ]."  [Court Doc. No. 193-2, p. 32].

Menominee hired Onyx Environmental Services ("OES") to undertake the cleanup and proper disposal of the hazardous wastes found at the Site.  [Court Doc. No. 193-2, p. 31].  OES

-4-

filled eight 85-gallon drums with hazardous waste from the Site and properly disposed of the waste.  *Id.* at pp. 31, 49.

STS continued to investigate potential contamination at the Site and took additional soil borings and soil samples.  [Court Doc. No. 193-2, p. 64].  After OES removed the barrels of hazardous waste, Menominee conducted a thorough "walkthrough" of the entire Site using several employees to review all areas of the Site.  [Court Doc. No. 193-5, Deposition of George Arvid Cowell ("Cowell Dep."), pp. 88-89].  During the walkthrough the city employees discovered various other waste items, including pieces of concrete, a half-full 30-gallon oil drum, a bucket filled with remnants of tar, and various car parts.  *Id.* at pp. 91-100.  OES removed the hazardous wastes discovered during the walkthrough.  *Id.* at pp. 105-06.

In August of 2003, Menominee realized that additional contamination existed near the southern boundary of the Site.  City Manager Anthony Furton wrote to Mr. Austin regarding the additional contamination.  [Court Doc. No. 193-2, p. 33].  He indicated that Menominee had fenced the area off and was conducting testing for lead and chromium of nine samples per each quarter acre.  *Id.*  On September 4, 2003 Menominee requested the EPA's assistance in remediating the Site due to Menominee's concerns about its financial ability to undertake a complete remediation.  *Id.* at p. 64.  Although Mr. Pape complained to the MDEQ about Menominee's response to the contamination issues at the Site, the Chief of MDEQ's Remediation and Redevelopment Division, informed Mr. Pape that both the MDEQ and the EPA "found the City's approach to be an appropriate response to the property conditions."  [Court Doc. No. 193-2, p. 35].

In October 2003 the EPA agreed to undertake a complete environmental assessment of

the Site and collect more soil samples and one water sample. [Court Doc. No. 193-2, p. 36].

After testing of the EPA's samples revealed elevated levels of lead and chromium, Mr. Rhame

recommended that the EPA fund a complete cleanup of the Site at a cost of $357,360. The EPA

approved the request on February 25, 2004. *Id.* at pp. 64, 37-43. Krygoski contends that it took

additional soil and groundwater samples near the Site in October of 2003 that revealed elevated

levels of chromium. However, the Court can find no evidence in the record relating to this

testing.

During March and April of 2004, the EPA undertook a complete cleanup of the Site.

[Court Doc. No. 193-2, pp. 48-50]. Among other activities, the EPA cleared vegetation from the

Site; dug investigative trenches to search for oil drums or other hazardous waste containers;

collected and tested numerous additional soil and water samples; drained the wetland; removed

and disposed of 240 tons of hazardous soil and 230 tons of nonhazardous special waste; collected

post-removal samples and conducted air monitoring. *Id.* at pp. 68-69; [Court Doc. No. 193-3, pp.

13, 16].

Once the EPA completed its remediation activities, it collected 20 additional soil

samples. [Court Doc. No. 193-2, p. 68; Court Doc. No. 193-3, pp. 1-16]. The EPA confirmed

that all Site samples were below applicable regulatory criteria for lead and chromium. [Court

Doc. No. 193-2, p. 48]. In May of 2004, Mr. Austin wrote to Menominee's City Manager, Mr.

Furton, that "[b]ased on the information submitted [from the EPA], the areas of paint waste

materials have been clean [sic] up and do not require further remediation." *Id.* The MDEQ then

issued a memorandum indicating that "no further action" was warranted at the Site. *Id.* at pp. 49-

50.

-6-

Although Mr. Pape directed additional testing of soil samples retrieved from the Site after the beginning of this litigation, these unauthorized tests did not reveal further contamination. [Court Doc. No. 193-8, Deposition of Dale Kenneth Pape ("Pape Dep."), pp. 104-05, 113-116]. Mr. Pape also conducted soil tests of the Krygoski property in August of 2004. The tests revealed no contamination above regulatory criteria. *Id.* at pp. 110-112. The record does not reveal any contaminants above regulatory criteria found at any time on Krygoski's property.

In June of 2005, after Menominee had begun construction work at the Site, Menominee discovered a nine-square-foot "smear" of paint waste at the Site. Cowell Aff., ¶ 6. Menominee immediately notified the EPA of its discovery, and the EPA removed the waste in August of 2005. *Id.* By October of 2005, Menominee was finished with 85% of its construction and renovation work at the Site. *Id.* at ¶ 7.

Krygoski devotes much of its briefing to the alleged contamination of a site adjacent to the Site that consisted of a junkyard and auto body shop ("Sorenson Site"). Krygoski submits affidavits from an individual who formerly worked at the Sorenson Site who testified that he observed a construction crew dig a 30 foot by 30 foot hole on the Sorenson Site and fill it with 15 to 20 drums of automotive waste paint, used motor oil, rusted car parts, and broken concrete. *See* [Court Doc. No. 192-9, Affidavit of Mark Koeppler ("Koeppler Aff."), ¶¶ 4-5]. The former employee, Mark Koeppler, alleges that the pit was then covered with sand and junk cars and that a crew erected a fence around the area. Koeppler Aff., ¶ 6. Krygoski asserts that contamination alleged by the former Sorenson Site employees also occurred at the Site based on the types of waste detected at the Site. It presents the affidavit of another former Sorenson Site employee who testified that he witnessed crews burying contaminants such as paint thinners and paint

waste on the Site at a depth of ten to fifteen feet.  [Court Doc. No. 140, Affidavit of Rick Dasko ("Dasko Aff."), ¶¶ 2-6].  Krygoski also presents testimony that these former employees received death threats from the owner of the Sorenson Site.  Koeppler Aff., ¶ 8; [Court Doc. No. 192-12, Affidavit of Charles F. Boehm ("Boehm Aff."), ¶ 8].   It further asserts that one of the former employees believes an unknown perpetrator attempted to kill him, by attaching a wire across a path he habitually rode on his all-terrain vehicle.  Koeppler Aff., ¶ 9.  One former Sorenson Site employee asserts he witnessed the use of Menominee trucks to dispose of and bury barrels and large containers filled with unknown liquid substances on the Site.  Boehm Aff., ¶¶ 3-4.  The evidence of the use of Menominee trucks allegedly demonstrates a conspiracy by Menominee and the Sorenson Site owner to contaminate the Site and conceal their contamination.  Krygoski appears to present this former employee testimony in support of its contention that Menominee has not properly remediated the Site because contaminated materials still remain buried beneath the area remediated by Menominee and the EPA.  The Court finds that most of these facts are irrelevant to a determination of whether Krygoski has demonstrated a prima facie case under CERCLA's Section 107.

Krygoski seeks reimbursement for its environmental soil tests, as well as for its attorneys' fees and the alleged "expert fees" of Mr. Pape.  [Court Doc. No. 193-8, pp. 20-126].  As of November of 2005, plaintiff sought $253,472.61 in "response costs" consisting primarily of attorneys' fees and "expert fees."  [Court Doc. No. 192-17].

## II.    Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The burden is

on the moving party to show conclusively that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Fed. R. Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations.  The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *White*, 909 F.2d at 943-44; *60 Ivy Street*, 822 F.2d at 1435.  The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof.  *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of the witnesses, and determine the truth of the matter. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *60 Ivy Street*, 822 F.2d at 1435-36.  If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *University of Cincinnati v. Arkwright Mut. Ins. Co.*, 51

F.3d 1277, 1280 (6th Cir. 1995); *LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

The parties have filed cross-motions for summary judgment.  In such a situation, "the court must consider 'each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law' . . . The court reviews each motion under the familiar standard for summary judgment, *supra*.  The court must deny both motions if it finds there is a genuine issue of material fact, '[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment.'" *1325 "G" Street Assoc., LP v. Rockwood Pigments NA, Inc.*, 2004 WL 2191709 *3 (D. Md. 2004) (quotations omitted).

### III.   Analysis

### A.   Prima Facie Case of Liability under Section 107 of CERCLA

Section 107 of CERCLA provides that four types of potentially responsible parties ("PRPs") are liable for costs of "removal" or "remedial action" by the government, as well as "any other necessary costs of response incurred by any other person consistent with the national contingency plan."  42 U.S.C. § 9607(a)(4)(B).  The owner and operator of a facility constitutes a PRP.  42 U.S.C. § 9607(a)(1).  A facility includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . ."  42 U.S.C. § 9601(9).

CERCLA defines "response" as to "remove, removal, remedy, and remedial action . . . ." 42 U.S.C. § 9601(25).  The Act defines "remove" or "removal" in part as:

the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to

monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23).  CERCLA defines "remedy" and "remedial action" in part as:

those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate or cause substantial danger to present or future public health or welfare or the environment.

42 U.S.C. § 9601(24).

To state a prima facie case of cost recovery under CERCLA's § 107(a), the plaintiff must demonstrate:

(1) the site is a "facility"; (2) a release or threatened release of hazardous substance has occurred; (3) the release has caused the plaintiff to incur 'necessary costs of response'; and (4) the defendant falls within one of the four categories of PRPs.

*Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 347-48 (6th Cir. 1998) (citing *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir. 1989)); *see also Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 933 (6th Cir. 2004); *Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 653 (6th Cir. 2000).  Liability under § 107(a) is strict liability for PRPs.  *Centerior Serv. Co.*, 153 F.3d at 348.

Some Sixth Circuit decisions include in the third prong of the prima facie case that the response costs must be "necessary and consistent with the National Contingency Plan."  *Bob's Beverage, Inc. v. Acme, Inc.*, 264 F.3d 692, 696 (6th Cir. 2001) (citing *Pierson Sand & Gravel, Inc. v. Pierson Township*, 89 F.3d 835, 1996 WL 338624 (6th Cir. 1996)).  The National

Contingency Plan ("NCP") is a group of regulations "promulgated by the EPA under the authority of 42 U.S.C. § 9605, which establishes standards for the removal of hazardous substances." *Pierson Sand & Gravel, Inc.*, 89 F.3d 835, 1996 WL 338624 *2. *See also*, 40 C.F.R. § 300.700 *et seq*. Other courts in this Circuit have determined that the elements of necessity and consistency with the NCP are not elements of the prima facie case, but are relevant to the issue of damages only. *See Containerport Group, Inc. v. American Financial Group, Inc.*, 128 F.Supp.2d 470, 481 (S.D. Ohio 2001); *American Special Risk Ins. Co. v. City of Centerline*, 2002 WL 1480821 *13 (E.D. Mich. 2002).

Although the law is unclear whether compliance with the NCP is a part of a Section 107 prima facie case, the Sixth Circuit has indicated that "preliminary" or "initial" investigative costs may be recovered even if the plaintiff did not comply with the NCP. *Pierson Sand & Gravel, Inc.*, 89 F.3d 835, 1996 WL 338624 *6. Krygoski arguably seeks such preliminary investigative costs in this action. To be compensated for such expenses, however, a plaintiff must submit evidence regarding separate calculations for such initial investigative costs. *Id.*

The parties concede that Menominee is a PRP because it owned and operated the Site. *See* 42 U.S.C. § 9607(a)(1). Menominee also does not appear to contest that unknown persons released hazardous substances at the Site. The Site clearly qualifies as a "facility" defined in part as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed . . ." 42 U.S.C. § 9601(9).

Menominee argues, however, that Krygoski has failed to demonstrate causation and that Krygoski's alleged response costs were not necessary as required to state a prima facie case under Section 107. The Court addresses each of these arguments in turn.

-12-

### B.     Causation Element of Prima Facie Case

In addressing the issue of causation, the Sixth Circuit has noted that "'CERCLA focuses

on whether the defendant's release or threatened release caused harm to the plaintiff in the form

of response costs.' *Bob's Beverage, Inc.*, 264 F.3d at 696 (quoting *Control Data Corp. v.*

*S.C.S.C. Corp.*, 53 F.3d 930, 935 (8th Cir. 1995)).   In *Kalamazoo River Study Group* the Sixth

Circuit noted that Section 107 "requires only that a plaintiff prove 'that the defendant's

hazardous substances were deposited at the site from which there was a release and that the

*release* caused the incurrence of response costs.'" 228 F.3d at 655 (quoting *United States v.*

*Alcan Aluminum Corp.*, 964 F.2d 252, 266 (3d Cir. 1992)).   Many CERCLA cases are "two-site"

cases in which hazardous substances have migrated from one site onto the plaintiff's property.

When analyzing causation in such a situation, the Fourth Circuit has stated:

> Contrary to the rule followed in most areas of the law, the burden of proof as to
> causation in a CERCLA case lies with the defendant.   The plaintiff must prove
> only that contaminants which were once in the custody of the defendant could
> have travelled onto the plaintiff's land, and that subsequent contaminants
> (chemically similar to the contaminants once existing in defendant's custody) on
> the plaintiff's land caused the plaintiff to incur cleanup costs.

*Castaic Lake Water Agency v. Whittaker Corp.*, 272 F.Supp.2d 1053 (C.D. Cal. 2003) (quoting

*Westfarm Assoc. Limited Partnership v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669,

681 (4th Cir. 1995)).

Although liability under CERCLA is strict, federal courts still recognize that "the

derogation of liability does not eliminate the complaining party's burden of demonstrating a

causal connection between a release or threatened release and the incurrence of response costs. . .

. While causation may be elusive, a CERCLA plaintiff still shoulders the burden of alleging and

-13-

proving an unbroken chain of events occurred which bridged his necessary response costs to the

defendant's conduct." *Rhodes v. County of Darlington, South Carolina*, 833 F.Supp. 1163, 1190

(D.S.C. 1992).

      Federal courts have found a lack of causation where the plaintiff holds "no protectable

interest whatsoever in the property that [is] the subject of the investigation." *Pennsylvania*

*Urban Devel. Corp. v. Golen*, 708 F.Supp. 669, 671 (E.D. Penn. 1989) (relying on *Artesian*

*Water Co. v. New Castle Cty.*, 659 F.Supp. 1269, 1282-85 (D.Del. 1987), *aff'd*, 851 F.2d 643 (3d

Cir. 1988)). In *Artesian Water Co.*, the court noted that CERCLA's strict liability regime did not

"diminish the necessity of demonstrating a causal connection between a release or threatened

release and the incurrence of costs by a section 107 plaintiff." 659 F.Supp. at 1282. The court

held that "the defendant's conduct is a cause of the event if it was a material element and a

substantial factor in bringing it about." *Id.* at 1283.

      Krygoski appears confused by the causation prong of the prima facie case. It argues that

causation is not a part of the prima facie case; however, it misunderstands the nature of the

causation discussed in the cases upon which it relies. Krygoski cites *Kalamazoo River Study*

*Group* for the proposition that causation is not an element of liability under Section 107. 228

F.3d at 656. It is true that in the *Kalamazoo River Study Group* decision the Sixth Circuit states

that "causation is not an element of liability under § 107 . . ." *Id.* However, the Court is

discussing causation in the context of multiple PRPs contaminating a plaintiff's site and one PRP

contending that it was responsible for only a minuscule portion of the contamination. *See id.*

Since Section 107 imposes joint and several liability, such causation arguments are not relevant

to the prima facie case concerning liability, but may be relevant to an affirmative defense or to

the amount of damages for which a PRP is liable. *See id.* at 655-57. In *Kalamazoo River Study Group*, the Sixth Circuit confirmed that Section 107 still requires a plaintiff to demonstrate "'that defendant's hazardous substances were deposited at the site from which there was a release and that the *release* caused the incurrence of response costs.'" *Id.* at 655 (quoting *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 266 (3d Cir. 1992)).

In *Amoco Oil Co.* the Fifth Circuit noted that a "plaintiff who has incurred response costs meets the liability requirement as a matter of law if it is shown that *any* release violates, or any threatened release is likely to violate, *any* applicable state or federal standard, including the most stringent." 889 F.2d at 671. However, the Fifth Circuit also made clear that "we believe that the question of whether a release has caused the incurrence of response costs should rest upon a factual inquiry into the circumstances of a case and the relevant factual inquiry should focus on whether the particular hazard justified any response actions." *Id.* at 670.

In this action Krygoski seeks response costs in the form of reimbursement for environmental testing it performed at the Site, "expert fees" for Mr. Pape's work on the contamination issues at the Site, and attorneys' fees. The Second Amended Complaint states a cause of action under CERCLA's Section 107, not under its citizens' suit provision, 42 U.S.C. § 9659. [Court Doc. No. 33]. It is undisputed that Krygoski has no protectable property interest in the Site. Further, the record contains no evidence that any hazardous substances above acceptable levels were present on Krygoski's property at any relevant time. In addition, there is no evidence of a threatened release of hazardous substances from the Site to Krygoski's property beyond Mr. Pape's speculation. Neither the EPA nor the MDEQ, federal and state agencies that are experts in the area, have ordered Krygoski to participate in any cleanup, testing or

-15-

remediation activities.  No state or federal entity forced Krygoski to undertake sampling and

testing activities on property that it did not own.  Krygoski entered the Site without permission to

extricate soil samples for its own personal reasons.  Such response costs cannot fairly be said to

have been "caused" by the release of hazardous substances on the Site by unknown parties.

Krygoski argues that the contamination would never have been found without its intervention

and that the public health would have suffered.  This argument is unavailing.  Again, this case is

not a citizens' suit action.  Further, the Court finds that the hazardous waste at the Site would

have inevitably been discovered during the clearing of the vegetation and filling of the wetland

for construction of such facilities as baseball fields and concession stands.  Krygoski has simply

failed to demonstrate that a release or threatened release of hazardous substances *from* the Site *to*

its property caused it to incur response costs.  *See Kalamazoo River Study Group*, 228 F.3d at

655; *Rhodes*, 833 F.Supp. at 1190.  Rather, the response costs that Krygoski incurred stemmed

from its own voluntary efforts to obtain samples of soil from property in which it had no interest.

Krygoski directs this Court to no caselaw awarding response costs for sampling and testing the

soil of property in which the plaintiff had no interest.  This Court concludes that Krygoski's

actions were not justified.  *See Amoco Oil Co.*, 889 F.2d at 671.  Thus, Krygoski fails to

demonstrate the causation prong of its prima facie case under Section 107.

### C.      Necessary Response Costs under Section 107 of CERCLA

Federal courts have also defined response costs that are deemed "necessary" under

CERCLA's Section 107.  Several courts have determined that to show that response costs were

"necessary" a CERCLA plaintiff must demonstrate: "'(1) that the costs were incurred in response

to a threat to human health or the environment that existed prior to initiation of the response

action and (2) that the costs were necessary to address that threat.'" *Southfund Partners III v. Sears, Roebuck and Co.*, 57 F.Supp.2d 1369, 1378 (N.D. Ga. 1999) (quoting *Foster v. U.S.*, 922 F.Supp. 642, 652 (D.D.C. 1996)); *see also, Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 871 (9th Cir. 2001); *Amoco Oil Co.*, 889 F.2d at 669-70. Initial monitoring and investigation costs may be recoverable under CERCLA even without proof that a plaintiff's property was contaminated. *See Lansford-Coaldale Joint Water Authority v. Tonolli Corp.*, 4 F.3d 1209, 1218-19 (3d Cir. 1993). However, "a party seeking recovery of investigative costs under the CERCLA must demonstrate that such costs were necessary." *Foster v. U.S.*, 926 F.Supp. 199, 203 (D.D.C. 1996). Further, "a claimant's investigatory costs must be precipitated by a release of a hazardous substance and necessary to the remediation thereof." *Id.* In *Amoco Oil*, the Fifth Circuit determined that "the relevant factual inquiry should focus on whether the particular hazard justified any response actions." 889 F.2d at 670. In *Tonolli Corp.* the Third Circuit noted that:

> although CERCLA authorizes recovery for monitoring and evaluation costs even when a defendant has not actually contaminated the plaintiff's property, it also provides safeguards to ensure that a defendant will be liable only in situations in which: (1) there was a reasonable risk . . . that the defendant's release or threatened release of hazardous substances would contaminate the plaintiff's property; and (2) the monitoring and evaluation expenses were incurred by the plaintiff in a reasonable manner.

4 F.3d at 1219.

In defining the term "necessary," federal courts have found that "[t]esting and sampling expenses are necessary only if the party seeking to recover costs has an objectively reasonable belief that the defendant's release or threatened release of hazardous substances would contaminate his or her property." *Johnson v. James Langley Operating Co., Inc.*, 226 F.3d 957,

964 (8th Cir. 2000). Further, investigative activities that are litigation-related costs are not compensable under CERCLA. *See Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 481-82 (6th Cir. 2004). "[O]nly 'work that is closely tied to the actual cleanup . . . may constitute a necessary cost of response.'" *Id.* at 482; *see also Young v. United States*, 394 F.3d 858, 863 (10th Cir. 2005). In *Ellis* the Sixth Circuit affirmed the district court's decision that time spent by the plaintiffs observing and videotaping the defendants and their property was not compensable under CERCLA. 390 F.3d at 481-82. Federal courts have determined that costs cannot be "necessary" "absent some nexus between the alleged response cost and an actual effort to respond to environmental contamination." *Young*, 394 F.3d at 863 (citing *United States v. Hardage*, 982 F.2d 1436, 1448 (10th Cir. 1992)).

In *Rhodes* the district court granted summary judgment to the county on the plaintiff neighboring landowners' CERCLA claims because the landowners could not demonstrate that their alleged response costs were necessary. 833 F.Supp. at 1188-89, 1198. The court determined that the plaintiff landowners had not incurred any necessary response costs in part because their investigatory testing of contamination of their own properties was not conducted under any government order. *Id.*

In this action, Krygoski's initial testing and sampling activities were not tied to the actual cleanup of the Site. *See Ellis*, 390 F.3d at 481-82; *Young*, 394 F.3d at 863. Menominee and the EPA undertook all the cleanup and remediation activities. As noted *supra*, Menominee would have inevitably discovered the contamination while preparing the Site for construction. Further, Krygoski did not undertake its sampling and testing activities pursuant to any government order. The government has never ordered Krygoski to do anything, either with respect to the Site or its

-18-

own property.  *See Rhodes*, 833 F.Supp. at 1188-89.  Krygoski has failed to show any evidence of

a threat of contamination to its own property beyond Mr. Pape's speculative conclusions.  The

Court also finds that accessing another entity's property surreptitiously to collect samples for

testing is not a response cost undertaken in a reasonable manner.  *See Tonolli Corp.*, 4 F.3d at

1219.

Krygoski also seeks Mr. Pape's "expert" fees and its attorneys' fees as necessary response

costs.  The U.S. Supreme Court has held that attorneys' fees for litigation-related activities are

not compensable under CERCLA.  *Key Tronic Corp. v. United States*, 511 U.S. 809, 819, 114

S.Ct. 1960, 128 L.Ed.2d 797 (1994); *see also Village of Milford*, 390 F.3d at 935.  Only those

costs that "relate to activities that could be 'performed by engineers, chemists, private

investigators, or other professionals who are not lawyers'" are compensable under CERCLA.

*Village of Milford*, 390 F.3d at 935 (quoting *Key Tronic Corp.*, 511 U.S. at 819).  As the Sixth

Circuit has clarified:

> A CERCLA plaintiff may recover attorney's fees if the activities for which the
> fees are incurred could have been performed by a non-attorney, are closely tied to
> an actual cleanup, are not related to litigation, and are otherwise necessary.  Such
> activities may include, but are not limited to, identification of PRPs.

*Village of Milford*, 390 F.3d at 936.  Fees for expert witnesses are not compensable under

CERCLA unless they are a necessary part of remediating a site and closely related to the cleanup.

*Redland Soccer Club, Inc. v. Department of Army of U.S.*, 801 F.Supp. 1432, 1437 (M.D. Penn.

1992); *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 92 (2d Cir. 2000).  Compensable costs

under CERCLA are expenses of clean-up, not of preparation for litigation.  *Redland Soccer Club,

Inc.*, 801 F.Supp. at 1437; *Gussack Realty Co.*, 224 F.3d at 91-92.

Mr. Pape's "expert" fees were not necessary because they were not tied to the actual cleanup of the Site.  Mr. Pape submits an affidavit indicating that his fees were related to the investigation of hazardous substances at the Site and the investigation of other PRPs.  [Court Doc. No. 203-23, Affidavit of Dale K. Pape Sr. ("Pape Aff. II")].  However, Krygoski had no ownership interest in the Site and was under no obligation to undertake such activities.  Moreover, if any entity was entitled to bring a contribution action against other PRPs under CERCLA's Section 113, Menominee would have been the party to conduct such investigations.  *See* 42 U.S.C. § 9613.  Thus, Mr. Pape's alleged "expert" fees were not "necessary" response costs.

Mr. Pape also asserts that Krygoski's attorneys' fees were incurred through investigating the contamination of the Site, as well as identifying PRPs.  Pape Aff. II, ¶ 7.  However, Krygoski was under no government order to conduct any remediation, nor was its property the subject of the investigation for PRPs.  Such attorneys' fees were costs Krygoski voluntarily undertook for its own private reasons.  Krygoski's action is not a citizens' suit under CERCLA.  Further, Krygoski was under no obligation to investigate the Site and PRPs of the contamination at the Site.  Nor did it have a financial incentive to do so as a defendant in a Section 113 contribution action would have.  *See* 42 U.S.C. § 9613(f)(1).  Thus, Krygoski's attorneys' fees, even to the extent they were not related to litigation, do not constitute necessary response costs.[2]

---

[2] Krygoski's attorney fee records belie Mr. Pape's conclusory statements about his personal reasons for hiring Krygoski's attorneys.  [Court Doc. No. 193-8, pp. 30-126].  These records demonstrate that the majority of expenses Krygoski's attorneys charged to Krygoski were litigation-related.  The records are for such charges as preparing notices of intent to sue; conducting legal research; preparing complaints; drafting legal memoranda and briefs; reviewing client documents and emails; participating in client conferences; and communicating with this Court.  Such activities comprise the heart of litigation.  To the extent that any of Krygoski's attorneys' fees are not litigation-related, Krygoski makes no attempt to separate out such fees for this Court.

### D.      Innocent Landowner Defense

Menominee also asserts that it satisfies the criteria of the "innocent landowner"

affirmative defense under CERCLA.  *See* 42 U.S.C. § 9601(35)(A); 42 U.S.C. § 9607(b)(3).  To

establish the "innocent landowner" defense, Menominee must demonstrate by a preponderance of

the evidence:

> (1) a third party was the sole cause of the release of hazardous substances; (2)
> [Menominee] acquired the property after the hazardous substances were disposed
> of there; (3) at the time [Menominee] bought the property, it did not know that
> any hazardous substance was deposited there; (4) [Menominee] undertook
> appropriate inquiry prior to purchasing the property; and (5) once it became aware
> of the presence of hazardous substances at the site, it exercised due care under the
> circumstances.

*Containerport Group, Inc. v. American Financial Group, Inc.,* 128 F.Supp.2d 470, 479 (S.D.

Ohio 2001).

Although it appears from the record that Menominee may fulfill the requirements of the

innocent landowner defense, this Court declines to determine whether Menominee is an innocent

landowner.  Because Krygoski has failed to demonstrate its prima facie case under Section 107,

this Court does not need to address whether Menominee meets the requirements of the innocent

landowner affirmative defense.

### E.      Liability under Michigan's NREPA

The Michigan Environmental Response Act ("MERA"), the predecessor to the NREPA,

Mich.Comp. Laws § 324.20101 *et seq.*, was "similar in intent to, and patterned after" CERCLA.

*See City of Port Huron v. Amoco Oil Co., Inc.*, 583 N.W.2d 215, 219 (Mich. Ct. App. 1998).

The NREPA should be "construed in accordance with" CERCLA.  *City of Detroit v. Simon*, 247

F.3d 619, 630 (6th Cir. 2001) (citing *Freeport-McMoran Resource Partners Ltd. Partnership v.*

*B-B Paint Corp.*, 56 F.Supp.2d 823, 838 n.7 (E.D. Mich. 1999)).  Compensable costs under NREPA must be necessary costs.  *Simon*, 247 F.3d at 630; Mich.Comp. Laws § 324.20126a(1)(b).  Michigan courts have interpreted "necessary" to mean "required."  *City of Port Huron*, 583 N.W.2d at 222; *see also, Village of Milford*, 390 F.3d at 936.  For the reasons stated *supra*, this Court concludes that Krygoski's alleged response costs were not necessary under the Michigan NREPA.  Thus, this claim will be dismissed.

### IV.    Conclusion

After reviewing the record and the applicable law, the Court concludes that no genuine issue of material fact exists regarding plaintiff Krygoski's establishment of its prima facie case under Section 107 of CERCLA or the NREPA.  Therefore defendant's motion for summary judgment on plaintiff's CERCLA and NREPA claims will be GRANTED.  Plaintiff's motion for summary judgment on liability under CERCLA and the NREPA will be DENIED.  Plaintiff's CERCLA and NREPA claims will be DISMISSED WITH PREJUDICE.

A separate judgment will enter.

                              */s/ R. Allan Edgar*
Dated: 5/5/06                              R. ALLAN EDGAR
                              UNITED STATES DISTRICT JUDGE